UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:19-CR-00147-CRS-1

UNITED STATES OF AMERICA                                                                 PLAINTIFF

VS.

MIGUEL ANGEL PAULET KUPELIAN                                                     DEFENDANT

**REPORT AND RECOMMENDATION**

Defendant Miguel Angel Paulet Kupelian ("Kupelian") is charged with possession with intent to distribute methamphetamine and conspiring with his co-defendant, Nestor Ernesto Quevedo Gomez, to do the same, in violation of 21 U.S.C. § 846, 841(a)(1) and 841(b)(1)(A)(viii). (DN 18). Kupelian has filed two motions to suppress. First is a motion to suppress evidence obtained from the search of his residence. (DN 64). Second is a motion to suppress an incriminating statement Kupelian made during the search of his residence. (DN 65).

These motions were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) for a hearing, if necessary, and for findings of fact, conclusions of law, and recommendation. (DN 73). The Court held an evidentiary hearing on Kupelian's second motion on May 14, 2021. (DN 78). The parties filed post-hearing briefs. (DN 81; DN 82). For the following reasons, the Court recommends Kupelian's motions to suppress be denied.

I. Motion to Suppress Evidence Obtained from Search (DN 64)

A. Findings of Fact

On July 22, 2019, Detective Brian Reccius of the Louisville Metro Police Department presented an application for search warrant and affidavit to Jefferson District Court Judge Eric

1

Haner. (DN 68-1). The search warrant authorized searches of 11004 Harrison Lane, Louisville, KY (Kupelian's residence); Kupelian's person; and four vehicles. (*Id.*).

The affidavit set forth the following probable cause for issuance of the warrant. In the forty-eight hours before presenting the search warrant, Detective Reccius received information from a "confidential reliable informant" that a Cuban male was transporting large quantities of narcotics and keeping them at 11004 Harrison Lane in Louisville, Kentucky. (*Id.* at p. 5). The informant wished to remain anonymous in fear of his/her safety but had been deemed reliable in the past after giving information leading to "multiple large narcotics seizures, money seizures, weapons seizures, and local and federal prosecutions . . . ." (*Id.*).

Acting on this information, Detective Reccius conducted surveillance on the Harrison Lane residence. (*Id.*). At 2:00 PM, he witnessed an individual leave the residence carrying a brown and red bag. (*Id.*). Sometime later, Detective Reccius conducted a pedestrian stop of a Cuban male carrying what appeared to be the same brown and red bag. (*Id.*). The bag contained approximately five pounds of methamphetamine. (*Id.*).

As further support, the affidavit describes Detective Reccius' knowledge from his thirteen years of training and experience that narcotics traffickers commonly use stash houses to conduct their operations. (*Id.*). And the affidavit notes Detective Reccius' knowledge that using a location on a dead-end road, like the Harrison Lane residence, is common for storing and stashing large supplies of narcotics and cash because it is difficult for law enforcement to conduct surveillance. (*Id.*).

### B. Standard of Review

The Fourth Amendment to the United States Constitution provides that no warrants shall issue without probable cause. U.S. Const. amend. IV. To establish probable cause, the

governmental agent seeking the warrant must submit to the judge an affidavit providing facts that indicate "'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (quoting *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)). Probable cause is a "'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life.'" *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

Great deference is afforded to a judge's determination of probable cause. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc). When evaluating the sufficiency of an affidavit under this deferential standard, the affidavit must be considered under "the totality of the circumstances, not line-by-line scrutiny." *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) (citing *Gates*, 462 U.S. at 239). The reviewing court may not look beyond the "four corners of the affidavit" because any information known by the officer but not conveyed to the signing judge is irrelevant. *Brooks*, 594 F.3d at 492 (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)).

In assessing the information supplied to law enforcement by informants, the Court considers the informant's veracity, reliability, and basis of knowledge. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 646 (6th Cir. 2003) (citing *Gates*, 462 U.S. at 230). These factors "should not be understood as entirely separate and independent" from one another. *Gates*, 462 U.S. at 230. A strong showing of one factor may compensate for a deficiency of another. *Id.* at 233-234. Independent police corroboration of a confidential informant's tip is not required to establish probable cause unless there is no indicia of the informant's reliability. *United States v. Woosley*, 361 F.3d 924, 926-27 (6th Cir. 2004).

C. Conclusions of Law

In this case, the affidavit contains enough of the aforementioned components to support a finding of probable cause for the search of the Harrison Lane residence. First, the affidavit contains specific information from a confidential informant indicating that evidence of a crime would be found at the Harrison Lane property. The affidavit states the CI provided a tip that a Cuban male was storing large quantities of methamphetamine, cocaine, and marijuana in that residence and that a large shipment of narcotics had arrived there within the last forty-eight hours.

Second, the affidavit provides "some detail" of the informant's prior record of providing accurate information to the police. *See United States v. Jackson*, 470 F.3d 299, 307 (6th Cir. 2006) (quoting *Allen*, 211 F. 3d at 976). The affidavit specifically states that the CI "has been deemed reliable in the past and given information that has led to multiple large narcotics seizures, money seizures, weapons seizures, [and] local and federal prosecutions on multiple occasions." (DN 68-1, at p. 5).

Third, the affidavit indicates that Detective Reccius undertook investigation to corroborate the CI's tip. The affidavit describes Detective Reccius conducting surveillance on the Harrison Lane address and observing a male leaving with a red and brown bag. It goes on to describe Detective Reccius later conducting a pedestrian stop of a Cuban male carrying what appeared to be the same red and brown bag.

Finally, the affidavit describes Detective Reccius' ten years of experience and training in narcotics. From his experience, Detective Reccius has knowledge that houses on dead-end streets, like the residence in this case, are commonly used as stash houses for large supplies of narcotics and cash because it is difficult for law enforcement to conduct surveillance without being detected. (*Id.*).

Each element of the affidavit, when viewed in isolation, might be insufficient to establish probable cause. But when viewed in totality, as required by *Gates*, the information in the affidavit provided a "substantial basis" for the signing judge to believe that evidence of narcotics trafficking would be found at the Harrison Lane property.

Kupelian, attempting to undercut this conclusion, argues that Detective Reccius' affidavit is "bare bones." He challenges the affidavit's reliance on the CI's information because Detective Reccius did not claim a prior relationship with the CI and only used boilerplate language to speak to the CI's reliability. Kupelian further challenges Detective Reccius' corroboration efforts because nothing other than the "brown and red bag" and the "Cuban male" connect the pedestrian stop to 11004 Harrison Lane and the affidavit fails to identify when and where the pedestrian stop occurred. Kupelian asks the Court to compare Detective Reccius' affidavit to an affidavit from *United States v. Allen*, that was scrutinized for being bare bones and conclusory.

Kupelian's arguments focus on what the affidavit lacks. But "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Allen*, 211 F.3d at 975. An affidavit need not contain magic words, nor "present proof that would without question withstand rigorous cross-examination." *Id.*

Moreover, the facts of *Allen*, are distinguishable. There, the name of the CI was provided to the signing judge, the CI's reliability in matters with the affiant had extended over a five-year period, and the CI personally observed the criminal activity he reported. 211 F.3d at 976. The Sixth Circuit found that police corroboration of the CI's tip was not necessary based on those facts. *Id.* Kupelian's case, on the other hand, involves an anonymous CI. And although the affidavit provides less detail as to the CI's relationship with the affiant than the affidavit in *Allen*, it describes law enforcement's efforts to independently corroborate the tip. *Allen* does not render the search

warrant here invalid.

Kupelian's challenges to Detective Reccius' corroboration efforts also scrutinize each line of the affidavit, rather than considering the totality of the circumstances. Detective Reccius' corroboration efforts included conducting surveillance on the Harrison Lane residence following the tip. He observed an individual leaving the suspected stash house with a recognizable red and brown bag. At some point later, Detective Reccius stopped a Cuban male carrying what he believed was the same recognizable red and brown bag. Detective Reccius' observations that the individual stopped was Cuban and was carrying what appeared to be the same bag that had left the suspected stash house earlier aligned with the CI's tip that a Cuban male was storing narcotics at the Harrison Lane residence. Again, while there are questions left unanswered from the affidavit, the totality of the circumstances from the CI's tip, the CI's reliability, Detective Reccius' corroboration efforts, and Detective Reccius' knowledge based on training and experience provide enough to support a finding of probable cause.

Kupelian also calls attention to the fact that although the warrant lists him as a named suspect to be searched and lists four vehicles with license plate numbers, neither he nor the vehicles are mentioned in the affidavit. (DN 64, at p. 3). The absence of this information in the affidavit, Kupelian argues, supports the impression that the issuing judge merely rubber stamped the police activity without making his own probable cause determination.[1] (DN 71, at p. 3).

While Kupelian is correct that the affidavit did not specifically mention his name or the four vehicles, the Sixth Circuit has noted that an "infirmity due to overbreadth does not doom the entire warrant." *United States v. Castro*, 881 F.3d 961, 965-66 (6th Cir. 2018) (citing *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001)). Rather, the remedy is to "sever the offending phrase

---

[1] Kupelian correctly notes that the United States did not respond to this argument in its Response.

from the warrant, suppress any evidence collected under it, and admit the evidence collected under the valid portions that remain." *Id.* (severing a warrant's "catch-all phrase" because the invalid section could be severed without changing the meaning of the valid sections of the warrant") (citing *Greene*, 250 F.3d at 477 (citing 2 Wayne R. LaFave et al., Search and Seizure § 4.6(f) (5th ed. 2017)). While the facts here are distinguishable from *Castro*, in that the invalid portion of this warrant authorized the search of Kupelian's person and the four vehicles, the Court finds the warrant's authorizing the search of the Harrison Lane address is sufficiently particularized and distinguishable from the unsupported search locations. *Id.* (quoting *United States v. Sells*, 463 F.3d 1148, 1151 (10th Cir. 2006)).

The affidavit's failure to provide specifics regarding Kupelian and the vehicles does not weaken the integrity of the warrant as applied to the residence. The Court notes that regardless of the warrant authorizing a search of Kupelian and four vehicles, it appears Detective Reccius limited his search to that of the residence. Nothing in the record shows that any evidence in the case was seized from Kupelian's person or the four vehicles. (*See, e.g.,* DN 68-2 (seized property log from search of 11004 Harrison Lane)). It is, therefore, appropriate to sever the warrant's authorization of searching Kupelian's person and the four vehicles from the valid search of the Harrison Lane residence.

The United States argues that even if the Court did not find probable cause existed, the evidence was properly admitted pursuant to *Leon*'s good-faith-reliance exception to the exclusionary rule. In *United States v. Leon*, the Supreme Court stated that evidence generally will not be excluded when officers reasonably rely on a facially valid search warrant. 468 U.S. 897 (1984). The inquiry is "whether a reasonably trained police officer would have known that the search was illegal despite the [issuing judge's] authorization." *Id.* at 923, n. 23. The good-faith

7

exception is inapposite in four instances:

> (1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot be reasonably presumed to be valid.

*Thomas*, 605 F.3d at 311.

Kupelian claims that *Leon* does not apply to validate the search warrant based on exceptions (2) and (3) above. (DN 71, at p. 3). Kupelian contends that the absence of any information about him and the four vehicles in the affidavit supports the impression that the issuing judge merely rubber stamped the police activity. The record contradicts Kupelian's argument. It is true that the issuing judge signed the warrant despite the affidavit's lack of reference to Kupelian's person and the four vehicles. But this same warrant establishes probable cause for 11004 Harrison Lane. There is no evidence that the issuing judge "abandoned his neutral and detached role" in signing this warrant simply because part of the warrant, which the Court finds is severable, was unsupported.

And based on the analysis above regarding probable cause, the Court cannot say that the affidavit was so lacking that the issuing judge's approval was objectively unreasonable. Again, Detective Reccius independently investigated and corroborated the CI's tip as far as practicable. And this is not the type of warrant where a simple glance "would reveal deficiencies glaring enough to make reliance on it unreasonable." *Castro*, 881 F.3d at 966 (citing *United States v. Watson*, 498 F.3d 429, 432 (6th Cir. 2007) (add'l citation omitted)).

For these reasons, the Court recommends Kupelian's Motion to Suppress (DN 64) be denied.

## II. Motion to Suppress Statements (DN 65)

### A. Findings of Fact

During the search of the Harrison Lane residence, Detective Reccius arrested and detained Kupelian. (DN 79, at p. 47). Detective Reccius called Officer Marbin Batista Garcia ("Officer Garcia") to the scene to serve as a translator while he interviewed Kupelian.[2] During the interview, Kupelian made several incriminating statements. Officer Garcia and Detective Reccius both testified at the evidentiary hearing regarding their interview with Kupelian.

Officer Garcia testified that he is a Cuban native, fluent in Spanish, and that he was frequently utilized as a translator during his five years as a Louisville Metro Police Officer.[3] (DN 79, at pp. 5-6). At the hearing, Officer Garcia confirmed that on July 22, 2019, he interpreted for Detective Reccius during his interview with Kupelian and translated *Miranda* warnings for Kupelian. (*Id.* at pp. 8-9). Specifically, Officer Garcia recalled that Detective Reccius used his *Miranda* card to read Kupelian his rights in English, and then Officer Garcia translated those rights into Spanish for Kupelian. Officer Garcia read the contents of the *Miranda* card into the record during the hearing:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to speak to an attorney, and to have an attorney present during any questioning. If you cannot afford a lawyer, one will be provided for you at the government expense.

(Supp. Hearing, Ex. 1).

After he translated the rights in Spanish, Officer Garcia asked if Kupelian understood his rights. (*Id.* at p. 27). Once Kupelian answered affirmatively, Officer Garcia and Detective Reccius

---

[2] Officer Marbin Batista Garcia is sometimes referred to as "Officer Batista" and other times as "Officer Garcia." For purposes of this Report and Recommendation, the Court will refer to him as Officer Garcia.

[3] Officer Garcia is no longer employed by the LMPD; he is "in the process of getting employed with Pasco Sheriff's Department" in Tampa, Florida. (DN 79, at pp. 3-4).

proceeded with the interview. (*Id.*).

Officer Garcia had difficulty remembering details from the day in question. When shown a photograph of Kupelian at the scene, Officer Garcia indicated he could not remember the individual's name, and that he thought "Garcia" was the individual's last name. (DN 79, at p. 10). Officer Garcia later clarified that he translated interviews for many individuals at the scene and that there were "too many names to remember." (*Id.* at pp. 13-14). Officer Garcia further indicated that he had "no problems" understanding the individuals he translated for and that the individuals didn't have any problems understanding him. (*Id.* at p. 16). He also stated that none of the individuals he spoke with appeared to be intoxicated and he was not aware of anyone coercing or intimidating Kupelian into being interviewed by law enforcement. (*Id.* at p. 15).

On cross-examination, Officer Garcia stated that while he did not recall Kupelian's last name, he recognized his face and recalled the interview with him was long and "could have been an hour." (*Id.* at pp. 19-20). Officer Garcia also could not remember some of the specifics of the conversation but recalled Kupelian saying there were drugs and guns in the house that he was holding for somebody else. (*Id.* at pp. 22-23).

When asked whether he recorded his translation of the *Miranda* rights or the interview with Kupelian, Officer Garcia explained that he believed he was recording using his body camera but that the videos either didn't record or were somehow deleted. (*Id.* at pp. 30-32). He testified that he did not delete anything from his body camera and that he doesn't have the ability to do so. (*Id.* at p. 37).

Detective Reccius' recollection of the events is largely the same as Officer Garcia's but provides more detail. Detective Reccius testified that because he does not speak Spanish, he enlisted Officer Garcia to assist with his interview of Kupelian and others at the scene. (*Id.* at p.

10

45). Detective Reccius corroborated that he read Kupelian his rights from the *Miranda* card in English, and then Garcia translated the rights to Kupelian in Spanish. According to Detective Reccius, Officer Garcia then communicated that Kupelian understood his rights and was willing to speak to law enforcement. (*Id.* at p. 47). Detective Reccius testified that Kupelian did not appear intoxicated, that nobody threatened Kupelian regarding his need to speak with law enforcement, and that no promises were made to Kupelian to get him to speak with law enforcement. (*Id.* at pp. 54-55).

Detective Reccius recalled that during the interview Kupelian stated that there were drugs in the back bedroom of the home but that the drugs were not his and he was holding them for someone else. (*Id.* at p. 49). Detective Reccius also recalled Kupelian stating that the guns in the home belonged to him. (*Id.* at pp. 49-50). Detective Reccius estimated that the interview with Kupelian lasted "roughly ten minutes or less." (*Id.* at p. 50).

Detective Reccius was also questioned regarding why the waiver and interview were not recorded or memorialized in writing. He testified that he did not have Kupelian sign an acknowledgement of rights waiver form because he didn't have one on his person. (*Id.* at p. 51). As to the lack of audio and video recordings, Detective Reccius explained that he was not issued a body camera at the time and he didn't ask any other officer to use their body camera. (*Id.* at pp. 50). He clarified that he did not direct anyone to delete or intentionally not record the interviews that day. (*Id.* at p. 57). On cross-examination, counsel asked whether Detective Reccius made a decision not to record Kupelian's statements with his phone, to which Detective Reccius answered: "correct." (*Id.* at p. 66).

The Uniform Citation completed by Detective Reccius immediately following the search reflects this series of events, (Supp. Hrg. Ex. 5) ("Detective read subject his Miranda rights via a

translator" and "subject agreed to talk to detective"). So does the FBI-302 form that was later completed by agent Michael Munson. (Supp. Hrg. Ex. 7) ("Kupelian was read his Miranda rights via Louisville Metro Police Officer Marbin Garcia. Ofc Garcia acted as a translator for the interview. The interview was not recorded.").

## B. Legal Standard

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege against self-incrimination attaches whenever an individual is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). The Supreme Court established in *Miranda* "'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Florida v. Powell*, 559 U.S. 50, 59 (2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)).

A suspect may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. To determine whether a defendant has validly waived his rights, the Court considers the totality of the circumstances. The government has the burden of proving, by a preponderance of the evidence, that an individual validly waived his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

A waiver of *Miranda* rights need not be made expressly or in writing. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citation omitted). "[C]ourts may infer an implied waiver 'from the actions or words of the person interrogated.'" *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (quoting *North Carolina v. Butler*, 441 U.S. 369, 376 (1979)). A suspect's

uncoerced statement establishes an implied waiver of the right to remain silent "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused." *Berghuis*, 560 U.S. at 384. To establish an implied waiver, the prosecution must show: "(1) that a *Miranda* warning was given; (2) that it was understood by the accused; and (3) that the subsequent statement was uncoerced." *United States v. Miller*, 562 F. App'x 272, 289 (6th Cir. Apr. 1, 2014) (citing *Berghuis*, 560 U.S. at 384).

### C. Conclusions of Law

The issues here are whether law enforcement's warnings to Kupelian were adequate and, if so, whether Kupelian waived his rights.

#### i. Adequacy of the Warnings

Kupelian claims that law enforcement did not advise him of his "right to discontinue questioning at any time," a right he claims is an essential part of the panoply of rights protected by the Fifth Amendment. (DN 82, at p. 6).

*Miranda* requires the police to provide a suspect with four essential warnings: "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Florida v. Powell*, 559 U.S. 50, 59-60 (2010) (quoting *Miranda*, 384 U.S. at 479). The precise wording of a *Miranda* warning is flexible; there is "no talismanic incantation . . . required to satisfy [*Miranda*]." *California v. Prysock*, 453 U.S. 355, 359 (1981).

Kupelian relies on *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009), which borrows language from the Supreme Court's opinion in *Colorado v. Spring*, 479 U.S. 564, 574 (1987), for the proposition that a valid *Miranda* advisement must include the suspect's freedom to discontinue talking at any time. While *Garner* and *Spring* hold that *Miranda* warnings protect the privilege against self-

13

incrimination by ensuring a suspect knows that he may choose to stop talking to law enforcement, these cases did not alter or amend the four essential *Miranda* warnings. In *Spring*, the Court simply observed that the four enumerated warnings convey that a person has a choice as to whether or not to speak, or put otherwise, he may remain silent. *United States v. Square*, 790 F. Supp. 2d 626, 633-634 (N.D. Ohio, 2011) (discussing *Spring*, 479 U.S. at 574). The right to end an interrogation, therefore, is merely considered a means of exercising one's right to remain silent. *Miranda*, 384 U.S. at 467-68 (the right to remain silent conveys to a suspect "that his interrogators are prepared to recognize his privilege should he choose to exercise it.").

Moreover, the Sixth Circuit has rejected Kupelian's argument on several occasions. *United States v. Ellis,* 125 F. App'x 691, 699, 2005 WL 647782 (6th Cir. Mar. 22, 2005) (holding that a statement instructing the suspect that he has the right to stop answering questions at any point after questioning has begun "is not a phrase that the Supreme Court in *Miranda* suggested should be read to criminal suspects before interrogation); *United States v. Ricks*, 989 F.2d 501 (Table), 1993 WL 78781 (6th Cir. Mar. 19, 1993) (rejecting argument that *Miranda* requires right to stop answering questions at any time); *United States v. Davis*, 459 F.2d 167, 168-69 (6th Cir. 1972) (holding that *Miranda* warning not including statement that suspect could terminate any questioning provided an adequate and understanding appraisal of rights).

There is nothing defective about the warnings from Detective Reccius' card. Both Officer Garcia and Detective Reccius testified that Detective Reccius read the rights from the card in English and that Detective Garcia then translated the card into Spanish for Kupelian. The substance of the warnings given reasonably conveyed to Kupelian his rights as required by *Miranda*.[4]

### ii. Waiver of *Miranda* Rights

Kupelian argues the United States has not proven he voluntarily waived his rights by a

---

[4] Kupelian does not challenge Officer Garcia's translation of the *Miranda* warnings as inaccurate.

preponderance of the evidence. (DN 82, at pp. 5-7). Kupelian emphasizes that there is no written, audio, or video record of the alleged waiver and that the only evidence of waiver is Detective Reccius' assertion that "Officer Garcia told me that [Kupelian] understood his rights." (*Id.* at p. 5). Officer Garcia's statements, Kupelian argues, are not credible since Officer Garcia remembered very little about the day of the search or any details about Kupelian. (*id.* at pp. 5-6).

Having considered the totality of the circumstances, the Court finds Kupelian was informed of his *Miranda* rights and that he knowingly, intelligently, and voluntarily waived those rights. Detective Reccius testified that he read Kupelian his *Miranda* rights in English from a printed card he keeps in his wallet. He further testified that Officer Garcia then translated the statements on the card into Spanish for Kupelian. According to Detective Reccius, Officer Garcia then communicated that Kupelian understood his rights and was willing to speak to law enforcement.

Officer Garcia's testimony from the evidentiary hearing, albeit vague, corroborates Detective Reccius' version of events. Officer Garcia answered affirmatively when asked whether he translated *Miranda* warnings to Kupelian and interpreted for him during his interview with Detective Reccius. He likewise recalled that after translating the rights into Spanish, he asked if the individual understood those rights. Officer Garcia notified Detective Reccius that Kupelian understood, and the interview commenced.

The Court does not discount Officer Garcia's credibility because he wasn't able to identify Kupelian by name during the hearing for several reasons. First, Officer Garcia had five years' experience translating and interpreting at hundreds of crime scenes for the LMPD. He is from Cuba and speaks fluent Spanish. And, as Officer Garcia explained, he was not involved with the investigation other than being called on the day in question to serve as an interpreter. He had no prior knowledge regarding the individuals at the Harrison Lane residence. Critically, Officer Garcia translated *Miranda* rights and interpreted interviews for several individuals at the scene that day. He recalled that none of

15

the individuals he translated for had problems understanding him and vice-versa. Officer Garcia also explained that he can tell when a suspect is having trouble understanding because they cannot carry on a conversation but that he did not have that issue with Kupelian.

Detective Reccius bolstered Officer Garcia's recollections, testifying that Kupelian was responsive to the questions and did not have trouble understanding him through Officer Garcia's translation. Detective Reccius affirmed that Kupelian was fully advised of his rights in this case. Finally, both Officer Garcia and Detective Reccius recalled that Kupelian directed them to drugs in the house but indicated the drugs were not his. Both also testified that Kupelian stated someone else delivered the drugs to the house.

The fact that law enforcement did not have Kupelian execute a written waiver of his rights is not dispositive. *See Adams*, 583 F.2d 457, 467 (6th Cir. 2009); *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002). The same is true for the lack of audio or video recording of the events. *See, e.g., United States v. Ramirez*, No. 3:13-CR-82-CRS, 2016 WL 11214627, at *8 (W.D. Ky. Dec. 9, 2016). While written, audio, or video proof of these warnings undoubtedly would have assisted the Court here, none are a prerequisite to finding that the United States has satisfied its burden of establishing, by a preponderance of the evidence, that Kupelian made a knowing, intelligent and voluntary waiver of his *Miranda* rights.

Testimony from Officer Garcia and Detective Reccius reinforces the voluntariness of Kupelian's implied waiver. Both testified that Kupelian did not appear intoxicated, that nobody threatened Kupelian regarding his need to speak with law enforcement, and that no promises were made to Kupelian to get him to speak with law enforcement. There is no evidence here of intimidation, coercion, or deception.

And Kupelian's selective responses to interview questions supports a knowing and intelligent waiver. *See United States v. Crumpton*, 824 F.3d 593, 608 (6th Cir. 2016) (suspect was aware of his

rights when he "selectively declined to answer certain questions regarding the narcotics that were located in the home"). Detective Reccius testified that Kupelian admitted to the presence of drugs in the home but refused to identify the true owner of the drugs. Kupelian's choice to withhold certain information indicates he understood his right to remain silent and the consequences of waiving such right. *Id.*

For these reasons, the Court finds the United States has proven by a preponderance of the evidence that Kupelian validly waived his rights. The Court recommends Kupelian's Motion to Suppress Statements (DN 65) be denied.

### III. Recommendation

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion to Suppress Evidence (DN 64) and Motion to Suppress Statements (DN 65) be **DENIED.**

Regina S. Edwards, Magistrate Judge
United States District Court

July 12, 2021

### NOTICE

Therefore, under the provisions of 28 U.S.C. Sections 636(b)(1)(B) and (C) and Fed.R.Crim.P. 59(b)(2), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. Fed.R.Civ.P. 59(b)(2). If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 474 U.S. 140, 150-51, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985).

Copies:      Counsel of Record